488 So.2d 848 (1986)
Dr. and Mrs. Augusto LOPEZ-TORRES, Town of Ocean Ridge and Audubon Society of the Everglades, Appellants,
v.
DEPARTMENT OF TRANSPORTATION, Appellee.
No. 85-360.
District Court of Appeal of Florida, Fourth District.
April 30, 1986.
Rehearing Denied June 13, 1986.
*849 Hugh MacMillan, Jr., of Edwards & Angell, Palm Beach, for appellants Lopez-Torres.
James Brindell of Gunster, Yoakley, Criser, & Stewart, P.A., Palm Beach, for appellant Audubon Soc.
John C. Randolph and Maureen Hackett of Johnston, Sasser, Randolph & Weaver, West Palm Beach, for appellant Town of Ocean Ridge.
A.J. Spalla, Gen. Counsel, and Franz E. Dorn, Appellate Atty., Tallahassee, for appellee.
Marta M. Suarez-Murias of James W. Vance, P.A., West Palm Beach, amicus curiae for City of Boynton Beach.
J. Michael Haygood of Haygood & Williams, P.A., West Palm Beach, amicus curiae for Boynton Beach Community Redevelopment Agency.
LETTS, Judge.
This is a tale of two cities at odds over the location of a "replacement" bridge over the navigable inland waterway. The Department of Transportation (DOT) scheduled the bridge for construction at a different location from the existing deteriorating span. On the one hand, the City of Boynton Beach, situated on the mainland, sides with the DOT and seeks the replacement at the new location, 700 feet north of the old. On the other hand, the barrier island community of Ocean Ridge, and all the other adjacent barrier communities for that matter, want the replacement bridge constructed exactly where the existing bridge is in operation.[1]
The dispute arrives in our court as a consequence of a final administrative order entered by the DOT. This order reversed the hearing officer's ruling, the latter recommending, as a matter of law, that Ocean Ridge was entitled to a summary order.
As the hearing officer perceived it, the DOT was barred from relocating the state road bridge, within the territorial limits of the municipality of Ocean Ridge, because Ocean Ridge had enacted a comprehensive plan pursuant to section 163.3161, Florida Statutes (1983). This plan essentially disapproved such a relocation. The DOT rejected the hearing officer's recommendation principally because that recommendation disturbed the DOT's "plenary" and "exclusive" power to plan, establish and locate the state road system, said preemptive power granted to it by the legislature. In the instant case, the DOT's brief notes that if Ocean Ridge's comprehensive plan, calling for the bridge to remain where it is, were to be paramount, the DOT would become "hopelessly entangled in a web of government" [citing City of Miami Beach v. Rocio Corp., 404 So.2d 1066 (Fla. 3d DCA 1981)] because Boynton Beach, on the other side of the waterway, has adopted a comprehensive plan of its own, calling for the replacement bridge to be relocated 700 feet north of the old. These two plans, as the DOT points out, are irreconcilable and the DOT concludes that Ocean Ridge's must be rejected because it constitutes an attempt by a municipality to legislate beyond its territorial borders and therefore beyond its jurisdiction.[2]
Having thus reversed the hearing officer's recommended summary judgment, the *850 DOT went further, even though no full hearing had been held as originally requested under section 120.57(1), Florida Statutes (1983), and commanded that the bridge be rebuilt at the new location. By doing so, the DOT in effect ruled on the merits of Ocean Ridge's petition by simply denying it without explanation, without the availability of any evidentiary record of the proceedings heard before the hearing officer and without the petitioner ever having received a full hearing on those merits.
In its appellate brief, the DOT itself, accentuates the fact that the hearing officer neither held an evidentiary hearing nor had a record before him. This being so, under the normal expectations of jurisprudence, any reviewing entity including ourselves would likewise be without one. Administrative law, however, has a jurisprudence cut from a different cloth and a record does spring up before this court, without objection, in the form of what appears to be the DOT's own internal file. The DOT defends its course of action on the ground that it "was forced to decide the issue as a matter of law because it had no power to remand a recommended order." Without discoursing on our dissatisfaction with such administrative procedures, we conclude that the DOT's final order was clearly erroneous and constituted an abuse of discretion. As a consequence, we reverse and remand it.
Addressing ourselves first to the DOT's conclusion that the legislature has preempted local comprehensive plans and that plenary power has been granted to the DOT to plan, establish and locate the state road system, we cannot agree that that power is absolute. As we read State of Florida v. Florida State Improvement Commission, 75 So.2d 1 (Fla. 1954), the power vested in the DOT to plan and construct roads and bridges while admittedly "plenary" is not absolute and is limited to the lawful exercise of its discretion. Id. at 3. Much reference is made to a multitude of statutes involving Intergovernmental Programs, Transportation Planning and Land and Water Management. Individual sections of all of these statutes, and others, are invoked by the warring parties depending upon the point of view of the invoker. However, as we see it there is no need to inch our way through this legislative mine field. While it is true that under the dictates of Webb v. Hill, 75 So.2d 596, 599 (Fla. 1954), local municipalities have no vested lawful or discretionary authority to control the whereabouts of state roads, and only the DOT has that power, it is also true that, as the department correctly concedes in its brief, its dictates can be overridden if they are clearly erroneous and constitute an abuse of discretion. Having concluded that such clear error and abuse is present here, discussion of that aspect is sufficient to support our reversal without recourse to the raft of intertwining legislative pronouncements. In so deciding, we are not impermissibly reweighing the evidence in the DOT file because it agrees that the hearing officer heard none and that the DOT itself came to its conclusion as a matter of law, not fact, because it did not have the power to remand for another hearing. We do.
The DOT's admission that it did not resort to fact finding is sufficient unto itself to support reversal and remand for a full hearing. However, such might be an empty directive if the DOT, assuming the hearing officer repeats his support for the existing location, reverses him again, next time based on the factual material presently in its file. In this connection, we have examined that file to see if the DOT's conclusion could be affirmed on this occasion on the basis of a right-for-the-wrong-reason test. Applegate v. Barnett Bank of Tallahassee, 377 So.2d 1150 (Fla. 1979). It cannot and we choose to comment on why not.
The basic justification for the replacement bridge is set forth in the "Final Negative Declaration" as follows:
2. Need For the Proposed Action

The proposed action is made necessary by the deteriorating condition and the out of date design of the existing bridge, which is a two lane bascule bridge of the *851 scherzer rolling leaf type, built in 1936. The structure is in poor condition, due to forty years of exposure in the salty atmosphere. The latest bridge inspection report states "underdeck of bascule is heavily corroded ... and worn, and replacement of some concrete and electrical equipment is necessary." The control house is described as inadequate and too small, and the bridge is noisy in its operation.
Frequent bridge openings, caused by the ever increasing boat traffic on the Intracoastal Waterway, are contributing to the accelerated machinery wear. The existing bridge provides only 10 foot vertical clearance in the closed position, so it must be opened for virtually all craft except outboard runabouts.
The existing bridge has a roadway width of 20 feet, which is inadequate by present safety standards, especially as the approach roadways are much wider. They were widened in 1961 to two lanes plus a parking lane in each direction. The vertical alignment of the existing facility is also substandard.
Under a special Federal program, the Bridge Replacement Trust (BRT) Fund was set up to replace deteriorated, inadequate or unsafe bridges. This bridge has been scheduled as one of those in Florida to be improved under that program.
While the existing bridge has provided adequate service for 40 years, the replacement must be planned to serve far into the future, so the number of traffic lanes and the waterway vertical clearance should be increased to provide a facility which is safe and convenient for both motorists and yachtsmen.
This statement of need contains not one single word or reference requiring a relocation. Indeed it is conceded by all, including the DOT, that all this can be accomplished at the existing location and accomplished for a savings of over 5 million dollars.[3] According to the DOT, the relocation is favored because:
(1) THE OLD BRIDGE COULD REMAIN IN USE DURING THE CONSTRUCTION, THUS AVOIDING INCONVENIENCE AND FACILITATING EMERGENCY ACCESS ESPECIALLY DURING A HURRICANE.
Inspection of the DOT file does not uncover credible support for either of these reasons. In terms of inconvenience the DOT itself concedes it would be only a "small inconvenience" to automobile traffic. This concession is obvious because there are already five alternative bridges linking the barrier island with the mainland within ten miles of the project. Moreover, there is an unaffected bridge only one mile to the south of the project and yet another four miles to the north of it. In fact, as the map in the record clearly demonstrates, there is a super-abundance of existing bridges in this area. The DOT does make a passing reference to inconvenience to pedestrians, as distinct from motorists, but referring back to the statement of need, which we have set forth above, the purpose of the project is clearly related to "motorists and yachtsmen." There is no credible suggestion that the project is in any way being undertaken to benefit pedestrians. Much of what has been said in the preceding sentences also demonstrates no deprivation of emergency services to Ocean Ridge during construction, with one added consideration in the event of a hurricane. The DOT itself describes the Town of Ocean Ridge as "completely residential, containing mostly single family houses on large lots." Thus, though there are some low-rise apartment buildings, the density per acre is minimal and there is nothing in the record to suggest that evacuation would be a problem.
The DOT also defends its choice to relocate because
(2) THE RELOCATION AVOIDS POTENTIAL DAMAGE TO A CONDOMINIUM, *852 A RESTAURANT AND THREE OTHER BUSINESSES ON THE WEST SIDE OF THE EXISTING BRIDGE.
The DOT states that the affected condominium development would suffer "increased noise impacts" if the bridge remains where it is, yet, paradoxically, reference back to the statement of need shows that one of the given reasons for replacing the existing bridge is that it is too noisy now. The file clearly contemplates the new bridge will make less noise and there is discussion of how to eliminate "singing" on steel grids. As to loss of view to this one condominium development, the aerial map does not support this contention save as to a very few units. The major portion of the condominium buildings (with a total of 135 residents as of 1976) would appear to be unaffected by a fifteen-foot increase in height to the north of a bridge already in place for some forty years before the condominium was built. Demonstrably, the primary view of those few apartments that have one, is due east across the waterway over and beyond Ocean Ridge whose zoning mercifully prevents the building of mammoth high rises which would block out the ocean view. The potential damage to the four businesses is not detailed, but the DOT speculates that such will be occasioned by the necessity of a ramp to reach them. There is nothing in the file to elaborate on this and no evidence of damages is to be found in its file. By contrast the owners of many of the other businesses on this same street appeared at the 1977 public hearing to urge the retention of the bridge where it is. One shopping center spokesman alone, represented twenty-three businesses all of whom favored retention of the bridge at its present location.[4]
Turning now to exerpts in the DOT file which do not support the construction of the replacement bridge at the new location, we find:
(1) The DOT depends heavily on its choice to relocate on the fact that section 163.3167(4) of the Florida Statutes (1983), requires a municipality to prepare and adopt a comprehensive plan by July 1, 1979. Otherwise, the comprehensive plan of the County governs. As the DOT sees it, the failure of Ocean Ridge to adopt such a plan until 1982 resulted in the DOT receiving its guidance from the County-wide plan in existence during the "design hearing" phase of the project. The only reference to this we can find in the DOT file, however, is a 1975 communication from the Palm Beach County Area Planning Board to the DOT confirming that the bridge replacement is in conformance with the county comprehensive plan. That communication unequivocally states that the replacement bridge will be constructed at the existing location.[5] Accordingly the failure of Ocean Ridge to have its comprehensive plan in place during the design phase should have made no difference whatever. Moreover, plan or no, Ocean Ridge has in writing protested the moving of the bridge, according to the file, as far back as 1976.
(2) In November of 1983, the DOT's own value engineering department submitted a report recommending that the replacement bridge be constructed at the existing location.
(3) A further report from value engineering stated that a new four-lane bridge (as distinct from the present two-lane) cannot be justified at either location.
(4) A DOT conclusion, repeated on more than one occasion, is that the replacement bridge "is not expected to be the cause of any increase in traffic." Yet *853 the expectation of increased traffic is one of the stated justifications for the need for a four-lane bridge.
(5) The approach road on either side of the existing bridge was increased from two lanes to six lanes (including two parking lanes) in anticipation of a replacement bridge at the existing location. There is nothing in the file to indicate what is to happen to all of these lanes when the existing bridge is abandoned, except that Ocean Ridge claims to have recently discovered that the DOT has unpublished plans to turn the six lanes in Ocean Ridge into a massive parking lot.
(6) No right-of-way has been acquired for the relocation bridge and an estimated 3,200 foot (100 foot wide) right-of-way will have to be obtained.
(7) The necessary right-of-way for the relocation bridge will cut right across existing mangrove areas on either side of the waterway and disturb and destroy ecologically sensitive areas and wildlife. None such will be disturbed if the replacement bridge is constructed at the existing location.
(8) The nationally acclaimed consulting firm, hired by Boynton Beach to consider the question of where the replacement bridge should be, opted for the existing location. In addition, it should be noted that the Boynton Beach Resolution supporting the relocation calls for a "high silhouette" bridge. Presumably this is a reference to a "fixed" bridge not the drawbridge which the DOT has selected.
It is not our function, nor do we have the time to detail all of the data in the DOT file. Suffice it to say, the above eight-point list is exemplary and not exclusive.
We glean from the file that the primary motivation for the DOT's desire to relocate the bridge is to connect up I-95 with state road A1A (the latter a two-way single-lane road traversing Ocean Ridge) in a straight line east and west without a jog in it. At present, when the east-west connection (S.R. 804) reaches U.S. 1 in downtown Boynton Beach, it jogs 500 feet south and then turns east again to cross the existing bridge. The relocation would remove this 500 foot jog. From an engineering point of view, the result might be neater, cleaner, more efficient and safer, yet the file makes much of the point that most of the east-west traffic coming from I-95 will not have A1A as its destination and that 75% of it will turn north or south on U.S. 1 without intent to cross the waterway at all! This, coupled with the admission that traffic is not expected to increase, makes elimination of the jog of minimal importance especially when many of the merchants located in that jog area in downtown Boynton voiced opposition to the relocation (as did the Boynton Beach Board of Realtors). Elimination of the jog is even less important when there is already a "straight shot" connection between I-95 and A1A only one mile south of the existing bridge.
We also cannot agree that Ocean Ridge is acting outside its jurisdiction in opposing this relocation. Ocean Ridge is not blocking the passage of a state road seeking to pass through it en route to faraway places. The state road in question dead ends in Ocean Ridge because only the ocean lies beyond. Ocean Ridge is only objecting to the relocation within its own municipality and voices no opposition to anything happening on the other side of the waterway.
In 1984, the DOT paused to reconsider the advisability of the relocation project. It is significant to read the DOT secretary's concluding paragraph in his memorandum which decreed that the relocation project proceed:
It is my professional opinion that realignment to Boynton Beach Boulevard will better serve the transportation and economic needs of the citizens and merchants within the City of Boynton Beach. Please forward my recommendation on to appropriate city and county officials. [Emphasis added.]
In the above-quoted paragraph, as throughout the file, there is little or no consideration given to the citizens of Ocean Ridge.
*854 Finally, it is nowhere explained why the DOT is determined to construct nothing other than a four-lane 25-foot-high bascule drawbridge.[6] There is a recommendation from its own value engineering department that a two-lane bridge would suffice and there is a suggestion that openings might be limited to a specific number per hour. Also, the file reflects that a bridge only 15 feet high might solve the problem for the forseeable future. There is some reference to the necessity of obtaining a Coast Guard permit. However, it is unlikely that such a permit could be denied for a "replacement" bridge as the DOT insists the project calls for. In addition, only one of the nearby drawbridges are as much as 25 feet high. To the north, the Lantana bridge is only 13 feet high, and in West Palm Beach, two of the three bridges are 14 feet and the third only 17 feet. To the south two out of the three are 9 and 12 feet respectively, while the third, which is 25 feet high, is the much discussed bridge only one mile south of the existing location. Clearly, many of these other drawbridges, in addition to being less than 25 feet high, are only two-lane bridges. As to bridges generally, the DOT alludes to the Governor's Executive Order # 81-105, in part forbidding funding of bridges leading to the barrier islands unless they "can accommodate growth where there is a need and desire for economic development... ." The barrier islands in this area are largely built up, with low density. Indeed, the DOT concedes there is hardly any virgin land and that the four barrier island communities involved (all opposed to the relocation) will have little or no increase in population through the year 2000. Heeding the Governor's directive, it would appear from the file that there has been no showing of a desire for economic development; to the contrary, the file indicates inability to accommodate growth and solid opposition to economic development.
The applicable statute on transportation planning [section 339.155(2) and (3), Florida Statutes (Supp. 1984)] clearly demands that the DOT consider many factors whenever it develops state-wide transportation. Subsection 339.155(2)(f) requires consideration of:
The total environment of the community and region, including land use, entrepreneurial decisions, population, travel patterns, traffic control features, ecology, stormwater management plans, pollution effects, aesthetics, safety, and social and community values.
Since the DOT admits it ruled on this matter as one of law, and not as trier of the fact, it is clear the foregoing statute was not complied with.
As a consequence, we reverse and remand this cause for a full hearing pursuant to section 120.57(1). At that time, the hearing officer should consider all the matters in the file and any other evidence or testimony which the petitioners or the respondent seek to introduce.
This has proved to be a difficult case and the result is of far reaching and great public importance. Accordingly, we hereby certify the following questions to the supreme court:
1. WERE THE PROCEDURAL STANDARDS EMPLOYED IN THE CASE AT BAR SUFFICIENT TO JUSTIFY THE DOT'S DECISION ON THE MERITS?
2. HAS THE LEGISLATURE PREEMPTED MUNICIPALITIES FROM EXERCISING ANY CONTROL OVER THE ESTABLISHMENT OF STATE ROADS AND BRIDGES?
3. DOES THE DOT HAVE THE AUTHORITY TO ROUTE A STATE ROAD BRIDGE THROUGH OR INTO A MUNICIPALITY IN A CORRIDOR THAT SPECIFICALLY CONFLICTS WITH THE MUNICIPALITY'S COMPREHENSIVE GROWTH PLAN?
REVERSED AND REMANDED.
*855 BOARDMAN, EDWARD F., Associate Judge (Retired), concurs.
ANSTEAD, J., dissents with opinion.
ANSTEAD, Judge, dissenting.
While the majority opinion has made a good argument against the wisdom of the DOT's decision, I cannot agree that it has been demonstrated that the agency acted outside of its authority. In State v. Florida State Improvement Commission, 75 So.2d 1 (Fla. 1954), the Florida Supreme Court judicially validated the legislature's broad grant of discretionary authority to the DOT to make decisions such as the one involved herein:
In the planning and construction of roads and bridges discretion must be placed somewhere. The needs of communities, counties and the state may be considered by these agencies in which discretion is vested. It is well settled in this state that the authority of the Legislature over roads and bridges is plenary unless restricted or forbidden by some particular provision of the Constitution of the United States or of the State of Florida. The authority of the administrative agencies to whom is entrusted these governmental functions is limited only by the lawful exercise of their discretion. Within their respective areas of authority these public agencies exercise their discretion to devise plans and select sites to best serve the public need. When the plans adopted by such agencies do not exceed their lawful authority they should be upheld because the Court will not substitute its judgment for that of administrative agencies.
... .
The establishment, continuance and location of roads and bridges is vested in the discretion of administrative agencies. The sites or locations of public improvements have always been questions over which men differed. Experience has demonstrated that squabbles and disputes over locations and sites of public improvements always come into being at the very contemplation of a major public improvement.
75 So.2d at 3, 4. That this authority is preemptive was made clear in Webb v. Hill, 75 So.2d 596 (Fla. 1954):
The boards of municipalities and counties of the state are vested with no authority, duty or discretion with reference to the location, designation and construction of the state roads comprising the state highway system. They may argue, take sides, protest, or attempt to persuade or use influence for the special benefit of their property or municipality, but they have no lawful authority. The authority to exercise discretion and make decisions is vested in the State Road Department by the Legislature.
75 So.2d at 599. Consistent judicial recognition of this broad discretionary authority has continued unabated up to the time of this decision.
The only action now before us for review is the agency's holding that its prior decision was not invalidated by the adoption of Ocean Ridge's comprehensive plan in 1982, well after the agency decision was made and after the 1979 planning deadline imposed by the legislature. That holding appears eminently correct, not only because the legislature had previously given the state agency preemptive authority on this issue, see, e.g., sections 334.044 and 339.155, Florida Statutes (Supp. 1984), but also because the statutory scheme on local planning requires deference to the state agency. § 163.3211, Fla. Stat. (1983).[7]
There has been no demonstration in this appeal that the DOT has failed to comply with the relevant statutory scheme authorizing it to plan for and construct the bridge in question, including those provisions requiring public hearings and consideration *856 of local conditions.[8] Planning for this bridge began as early as 1968 when the DOT commissioned a study for the placement of a new bridge in the Boynton Beach area. That study culminated in a report recommending a new bridge at the location now under attack by appellants. In the intervening period there have been countless opportunities for all parties to express their views on the issue, and indeed, all parties, including Ocean Ridge, did so before a final decision was made. Now, in essence, DOT is being instructed to start this process all over again, presumably for the purpose of justifying its decision anew. But what are the rules of the game? What sort of a hearing is to be held? Who will have the burden to prove what, and by what standard should a decision be made?
NOTES
[1] There are, of course, crossover residents from Ocean Ridge who want the bridge relocated and Boynton Beach counterparts who want the bridge to remain where it is.
[2] Why the same would not be true of Boynton Beach's plan vis-a-vis Ocean Ridge is neither explained nor referred to by the DOT.
[3] The DOT seeks to reduce this savings by reference to an $800,000 user cost during the detour period, but its reasoning is unintelligible. The file also suggests that the new bridge may cost very much more than the estimate.
[4] Two other reasons are given in support of the DOT's choice but they concede them to be of minimal importance.
[5] Of concern is the statement in the final order that the "proposed bridge" is consistent with the transportation plan of the Palm Beach County Metropolitan Planning Organization. For this conclusion the order cites to DOT's Exhibit 4 (p. 264 of the record) which is a letter from FHWA. There is no quarrel with that, except insofar as the location of the "proposed bridge" is concerned. The location, according to the Area Planning Board of Palm Beach County in 1975, was Ocean Avenue (see record p. 222).
[6] Early consideration of a 65-foot-high level fixed bridge was abandoned as "not feasible."
[7] This same comprehensive planning scheme also suggests reference to the county master plan for the area in the absence of a plan by a municipality. The county plan, and of course the plan of the City of Boynton Beach, were both consistent with the agency's decision to relocate the bridge.
[8] As already noted, the claim on appeal is that DOT's decision to relocate the bridge was invalidated by Ocean Ridge's adoption of a comprehensive plan which does not provide for the relocation of the bridge.